IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:16-CV-252-D

AMERICAN ASSOCIATION OF )
POLITICAL CONSULTANTS, )
DEMOCRATIC PARTY OF OREGON, )
INC., PUBLIC POLICY POLLING, LLC, )
TEA PARTY FORWARD PAC, and )
WASHINGTON STATE DEMOCRATIC )
CENTRAL COMMITTEE, )
                              Plaintiffs, )
                  v. )              **ORDER**
JEFFERSON SESSIONS, )
Attorney General of the United States, )
and FEDERAL COMMUNICATIONS )
COMMISSION, )
                             Defendants. )

On May 12, 2016, the American Association of Political Consultants, Inc., the Democratic Party of Oregon, Inc., Public Policy Polling, LLC, the Tea Party Forward PAC, and the Washington State Democratic Central Committee (collectively, "plaintiffs") sued United States Attorney General Loretta Lynch in her official capacity and the Federal Communications Commission ("the FCC") (collectively, "defendants") [D.E. 1].[1] On August 5, 2016, plaintiffs amended their complaint [D.E. 18]. Plaintiffs contend that the autodialing ban in 47 U.S.C. § 227(b)(1)(A)(iii) of the Telephone Consumer Protection Act of 1991, as amended ("TCPA") violates the First Amendment. See Am. Compl. [D.E. 18] ¶¶ 2, 36–63. On September 2, 2016, defendants moved to dismiss plaintiffs'

---

[1] On February 19, 2017, Jefferson Sessions became Attorney General of the United States. A public officer's "successor is automatically substituted as a party." Fed. R. Civ. P. 25(d). On July 11, 2017, Tea Party Forward withdrew from this lawsuit. See [D.E. 37, 38].

amended complaint for lack of subject-matter jurisdiction [D.E. 22] and filed a memorandum in support [D.E. 23]. See Fed. R. Civ. P. 12(b)(1). On March 15, 2017, the court denied defendants' motion to dismiss [D.E. 26].

On May 19, 2017, plaintiffs moved for summary judgment [D.E. 30] and filed a memorandum in support [D.E. 31]. On June 19, 2017, defendants responded in opposition [D.E. 33], cross-moved for summary judgment [D.E. 34], and filed a memorandum in support [D.E. 35]. On July 5, 2017, plaintiffs responded and replied [D.E. 36]. On July 20, 2017, defendants replied [D.E. 39]. As explained below, this court joins the five other United States District Courts that have addressed the issue and holds that 47 U.S.C. § 227(b)(1)(A)(iii) does not violate the First Amendment. See Gallion v. Charter Commc'ns Inc., No. 5:17-cv-01361-CAS(KKx), 2018 WL 1135386, at *4–7 (C.D. Cal. Feb. 26, 2018) (unpublished), appeal docketed, No. 18-80031 (9th Cir. Mar. 8, 2018); Greenley v. Laborers' Int'l Union of N. Am., 271 F. Supp. 3d 1128, 1145–51 (D. Minn. 2017); Mejia v. Time Warner Cable Inc., 15-CV-6445 (JPO), 15-CV-6518 (JPO), 2017 WL 3278926, at *12–17 (S.D.N.Y. Aug. 1, 2017) (unpublished); Holt v. Facebook, Inc., 240 F. Supp. 3d 1021, 1032–34 (N.D. Cal. 2017), appeal docketed, No. 17-80086 (9th Cir. May 12, 2017); Brickman v. Facebook, Inc., 230 F. Supp. 3d 1036, 1043–49 (N.D. Cal. 2017). Thus, the court grants defendants' motion for summary judgment.

I.

After holding numerous hearings and compiling extensive evidence, Congress enacted the TCPA to protect the privacy interests of residential telephone subscribers. See Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243 § 2(10) (1991). Congress found that "[t]echnologies that might allow consumers to avoid receiving [robocalls] are not universally available, are costly, are unlikely to be enforced, or place an inordinate burden on the consumer." Id. § 2(11). In enacting

2

the TCPA, Congress recognized that every call, whether to a phone at home or in a person's pocket, "uses some of the phone owner's time and mental energy, both of which are precious." Patriotic Veterans, Inc. v. Zoeller, 845 F.3d 303, 305–06 (7th Cir. 2017); see Moser v. FCC, 46 F.3d 970, 972 (9th Cir. 1995); Mey v. Venture Data, LLC, 245 F. Supp. 3d 771, 777–80 (N.D. W. Va. 2017).

The TCPA makes it unlawful

> to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice—to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call, unless such call is made solely to collect a debt owed to or guaranteed by the United States[.]

47 U.S.C. § 227(b)(1)(A)(iii); see Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243 § 2(12) (1991). In 2015, Congress added the final clause of the TCPA, which exempts calls made solely to collect a debt owed to or guaranteed by the United States. See Woods v. Santander Consumer USA Inc., No. 2:14-cv-02104-MHH, 2017 WL 1178003, at *3 (N.D. Ala. Mar. 30, 2017) (unpublished); Bipartisan Budget Act of 2015, Pub. L. No. 114-74 § 301, 129 Stat. 584, 588 (2015).

The TCPA authorizes the FCC to implement regulations that may exempt some calls from this subsection.

> The [FCC] shall prescribe regulations to implement the requirements of this subsection. In implementing the requirements of this subsection, the [FCC]—
>
> (A) shall consider prescribing regulations to allow businesses to avoid receiving calls made using an artificial or prerecorded voice to which they have not given their prior express consent;
>
> (B) may, by rule or order, exempt from the requirements of paragraph (1)(B) of this subsection, subject to such conditions as the Commission may prescribe—
> (i) calls that are not made for a commercial purpose; and
> (ii) such classes or categories of calls made for commercial purposes as the Commission determines—

3

> > (I) will not adversely affect the privacy rights that this section is intended to protect; and
> >
> > (II) do not include the transmission of any unsolicited advertisement;
>
> (C) may, by rule or order, exempt from the requirements of paragraph (1)(A)(iii) of this subsection calls to a telephone number assigned to a cellular telephone service that are not charged to the called party, subject to such conditions as the Commission may prescribe as necessary in the interest of the privacy rights this section is intended to protect[.]

47 U.S.C. § 227(b)(2); see Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243 § 2(13) (1991) ("While the evidence presented to the Congress indicates that automated or prerecorded calls are a nuisance and an invasion of privacy, regardless of the type of call, the Federal Communications Commission should have the flexibility to design different rules for those types of automated or prerecorded calls that it finds are not considered a nuisance or invasion of privacy, or for noncommercial calls, consistent with the free speech protections embodied in the First Amendment of the Constitution.").

Plaintiffs are political organizations or polling organizations and want to be able to use an autodialer and prerecorded messages to convey and receive information. Using an autodialer and prerecorded messages costs a lot less than hiring and paying human beings to call a telephone number and (1) either obtain express consent of the called party for a prerecorded message or (2) convey or receive information.

In support of their argument that the TCPA's autodialing ban violates the First Amendment, plaintiffs cite statutory exceptions from the ban in the TCPA and exemptions from the ban in FCC orders. See Am. Compl. ¶¶ 22, 28–35. The statutory exceptions include calls made with the express consent of the called party, calls made for emergency purposes, or calls made to collect a debt owed to or guaranteed by the United States. See 47 U.S.C. § 227(b)(l)(A), (b)(l)(A)(iii). The FCC's

regulatory exemptions include uncharged calls from a wireless carrier to its customer, uncharged package delivery notifications, non-telemarketing communications where a third party has represented to the sender that the recipient has consented to the communications, emergency calls related to healthcare, certain calls related to identity theft, and calls from federal government officials conducting official business. See Telephone Consumer Protection Act of 1991, 77 Fed. Reg. 34233, 34235 (June 11, 2012) (exempting wireless carriers); In the Matter of Cargo Airline Ass'n Petition for Expedited Declaratory Ruling, 29 FCC Rcd. 3432, 3439 (Mar. 27, 2014) (exempting package-delivery notifications); In the Matter of GroupMe, Inc./Skype Commc'ns S.A.R.L., 29 FCC Rcd. 3442, 3444 (Mar. 27, 2014) (exempting third-party representation of consent); In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, 30 FCC Rcd. 7961, 8023-24, 8031 (July 10, 2015) (exempting certain calls related to healthcare and identity theft); In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, CG Docket No. 02-278 ¶ 12 (July 5, 2016) (exempting calls made by federal officials conducting official business).

Plaintiffs argue that 47 U.S.C. § 227(b)(1)(A)(iii) is an unconstitutional content-based restriction on speech because the government-debt exception and the FCC regulatory exemptions favor commercial speech over core political speech. See [D.E. 31] 5–6. Defendants respond that 47 U.S.C. § 227(b)(1)(A)(iii) is a valid, content-neutral law. See [D.E. 35] 6–13. Alternatively, defendants argue that 47 U.S.C. § 227(b)(1)(A)(iii) satisfies strict scrutiny. See id. at 20–28.

II.

Summary judgment is appropriate if the moving party demonstrates "that there is no genuine dispute as to any material fact" and the moving party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment must initially show an absence of a genuine dispute of material fact or the absence of evidence to support the nonmoving party's case.

5

Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). If a moving party meets its burden, the nonmoving party must "come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quotation and emphasis omitted). A genuine issue for trial exists if there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient . . . ." Id. at 252; see Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985) ("The nonmoving party, however, cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another."). Only factual disputes that might affect the outcome under substantive law preclude summary judgment. Anderson, 477 U.S. at 248. In reviewing the factual record, the court views the facts in the light most favorable to the nonmoving party and draws reasonable inferences in that party's favor. Matsushita, 475 U.S. at 587–88. "When cross-motions for summary judgment are before a court, the court examines each motion separately, employing the familiar standard under Rule 56 of the Federal Rules of Civil Procedure." Desmond v. PNGI Charles Town Gaming, L.L.C., 630 F.3d 351, 354 (4th Cir. 2011).

III.

The First Amendment "prohibits the enactment of laws abridging the freedom of speech[,]" and deprives the government of the "power to restrict expression because of its message, its ideas, its subject matter, or its content." Reed v. Town of Gilbert, 135 S. Ct. 2218, 2226 (2015); see U.S. Const. amend. I. "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." Reed, 135 S. Ct. at 2226; see R.A.V. v. St. Paul, 505 U.S. 377, 395 (1992). "Government regulation of speech is content based if a law

6

applies to particular speech because of the topic discussed or the idea or message expressed.... This commonsense meaning of the phrase 'content based' requires a court to consider whether a regulation of speech 'on its face' draws distinctions based on the message a speaker conveys." Reed, 135 S. Ct. at 2227 (citations omitted). Regulations or restrictions on speech which "depend entirely on the communicative content of the [speech]" are content-based regulations and are therefore subject to strict scrutiny. Id. If a restriction is facially content-based, courts apply strict scrutiny, "regardless of the government's benign motive, content-neutral justification, or lack of animus toward the ideas contained in the regulated speech." Id. at 2228 (quotation omitted). "[I]llicit legislative intent is not the *sine qua non* of a violation of the First Amendment." Id. (quotation omitted). "[T]he crucial first step in the content-neutrality analysis is to determine whether the law is content neutral on its face." Cahaly v. Larosa, 796 F.3d 399, 405 (4th Cir. 2015) (quotation and alteration omitted); see Reed, 135 S. Ct. at 2228.

The TCPA's government-debt exception is a content-based speech restriction "because it makes content distinctions on its face." Cahaly, 796 F.3d at 405. In order for a court to determine whether a potential defendant violated the TCPA's government-debt exception, the court must review the communicative content of the call. If the call was made "solely to collect a debt owed to or guaranteed by the United States," the defendant would not be liable under the TCPA. See 47 U.S.C. § 227(b)(1)(A)(iii). If the call concerned any other topic, the defendant would be liable. See id. For example, under the TCPA, "a private debt collection agency may call the same consumer twice in a row, once to collect a private, government-guaranteed loan and once to collect a similar private loan not guaranteed by the government, but, absent prior express consent, may place only the first call using an autodialer or prerecorded voice." Gallion, 2018 WL 1135386, at *4 (quotation omitted). This distinction derives from the call's communicative content. See id. at *5; Greenley,

7

271 F. Supp. 3d at 1146–49; Mejia, 2017 WL 3278926, at *14–15; Holt, 240 F. Supp. 3d at 1032–33; Brickman, 230 F. Supp. 3d at 1043–45; cf. Gomez v. Campbell-Ewald Co., 768 F.3d 871, 876–77 (9th Cir. 2014) (holding that the pre-2015 version of TCPA without the government-debt exception is content-neutral), aff'd on other grounds, 136 S. Ct. 663 (2016); Woods, 2017 WL 1178003, at *3–5 (same). In opposition to this conclusion, defendants argue that the government-debt exception is not content-based, but instead based on the relationship between the parties to the call. A restriction based on the relationship between a caller and a recipient is not content-based if the restriction applies independently of "what the caller proposes to say." Patriotic Veterans Inc., 845 F.3d at 304–05; see Van Bergen v. Minn., 59 F.3d 1541, 1550 (8th Cir. 1995).

This court rejects defendants' argument. First, "the plain language of the [government-debt] exception makes no reference whatsoever to the relationship of the parties." Gallion, 2018 WL 1135386, at *5 (quotation and alteration omitted); see Brickman, 230 F. Supp. 3d at 1045; cf. Patriotic Veterans, 845 F.3d at 305; Van Bergen, 59 F.3d at 1550. Second, the relationship at issue for the government-debt exception is the relationship between the government and the debtor, but the exception allows "a third party that has no preexisting relationship with the debtor" to use an autodialer or recorded voice to call to collect a debt owed to or guaranteed by the United States. Gallion, 2018 WL 1135386, at *5 (quotation omitted). Thus, the government debt-exception is "based on the subject matter of the call regardless of the caller's relationship to the recipient." Greenley, 271 F. Supp. 3d at 1148; see Gallion, 2018 WL 1135386, at *5.

Content-based speech restrictions are subject to strict scrutiny. See Cahaly, 796 F.3d at 405. Strict scrutiny does not mean "strict in theory, but fatal in fact." Williams-Yulee v. Fla. Bar, 135 S. Ct. 1656, 1666 (2015) (quotation omitted). "To survive strict scrutiny, the government must prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest."

8

Greenley, 271 F. Supp. 3d at 1149 (quotation and alteration omitted); see Reed, 135 S. Ct. at 2231; Cahaly, 796 F.3d at 405. The government also must use "the least restrictive means" among equally effective alternatives to accomplish its compelling state interest. See Ashcroft v. ACLU, 542 U.S. 656, 666 (2004).

As for whether the autodialing ban furthers a compelling state interest, the Supreme Court has reviewed and upheld Congress's extensive findings that "automated or prerecorded telephone calls made to private residences . . . were rightly regarded by recipients as an invasion of privacy." Mims v. Arrow Fin. Servs., LLC, 565 U.S. 368, 372 (2012) (quotation and alteration omitted); see Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243 § 2(10) (1991). The Supreme Court also has held that "[t]he State's interest in protecting the well-being, tranquility, and privacy of the home is certainly of the highest order in a free and civilized society." Carey v. Brown, 447 U.S. 455, 471 (1980); see Gallion, 2018 WL 1135386, at *5. "One important aspect of residential privacy is protection of the unwilling listener. . . . [I]ndividuals are not required to welcome unwanted speech into their own homes and . . . the government may protect this freedom." Frisby v. Schultz, 487 U.S. 474, 484–85 (1988); see Gallion, 2018 WL 1135386, at *5; cf. Cahaly, 796 F.3d at 405 (assuming that "protect[ing] residential privacy and tranquility from unwanted and intrusive robocalls" is a compelling state interest). Thus, the court concludes that protecting the well-being, tranquility, and privacy of the individual's residence is a compelling state interest and that the TCPA auto-dialing ban furthers that compelling interest. See, e.g., Patriotic Veterans, 845 F.3d at 305–06; Van Bergen, 59 F.3d at 1554; Gallion, 2018 WL 1135386, at *5–6; Greenley, 271 F. Supp. 3d at 1150; Mejia, 2017 WL 3278926, at *16; Woods, 2017 WL 1178003, at *5; Holt, 240 F. Supp. 3d at 1033; Brickman, 230 F. Supp. 3d at 1046.

Content-based speech restrictions that serve compelling state interests must be narrowly

9

tailored to meet those interests. See Reed, 135 S. Ct. at 2231; Cahaly, 796 F.3d at 405. Narrow tailoring requires that the restriction not be underinclusive or overinclusive in the speech that it restricts, and the government must use the least restrictive means to serve its interests. See Cahaly, 796 F.3d at 405–06. However, narrow tailoring does not require perfect tailoring. Williams-Yulee, 135 S. Ct. at 1671.

As for underinclusiveness, the "First Amendment imposes no freestanding 'underinclusiveness limitation,'" although underinclusivity raises a red flag about whether the regulation is truly targeted to further a compelling state interest. Id. at 1668. "It is always somewhat counterintuitive to argue that a law violates the First Amendment by abridging *too little* speech." Id. (emphasis in original). The underinclusiveness inquiry weighs "doubts as to whether the government is pursuing an interest it invokes or whether the statute furthers a compelling interest." Brickman, 230 F. Supp. 3d at 1046. A statute or regulation which admits too many exceptions fails to further a compelling interest. After all, "a law cannot be regarded as protecting an interest of the highest order, and thus as justifying a restriction on truthful speech, when it leaves appreciable damage to that supposedly vital interest unprohibited." Reed, 135 S. Ct. at 2232 (quotation omitted); see Republican Party of Minn. v. White, 536 U.S. 765, 780 (2002).

Plaintiffs make two underinclusiveness arguments. First, they argue that the government-debt exception is underinclusive in the same way that the sign ordinance invalidated in Reed was underinclusive and unconstitutionally favors speakers seeking to collect government debts. See [D.E. 31] 6. Second, they argue that Congressional delegation of exemption-making authority to the FCC provides the possibility for the proliferation of exemptions. See id. at 17–18.

As for the TCPA's government-debt exception, it stands in stark contrast to the sign ordinance that the Supreme Court invalidated in Reed. See Reed, 135 S. Ct. at 2224–28, 2231–32.

10

The sign ordinance in Reed exempted 23 categories of signs and allowed the unlimited proliferation of various other signs. See id. Unlike the exception-riddled sign ordinance in Reed, the TCPA's government-debt exception is a narrow exception that furthers a compelling interest. See Gallion, 2018 WL 1135386, at *7; Mejia, 2017 WL 3278926, at *16 ("[T]he federal government's interest in collecting debts owed to it supports the finding of a particularly compelling interest in exempting calls made for the purposes of collecting government debts."). Moreover, "the TCPA's express grant of authority to the FCC to restrict or limit the number and duration of calls made to collect a debt owed to or guaranteed by the United States" further limits the TCPA's government-debt exception. Gallion, 2018 WL 1135386, at *7 (quotation and alteration omitted). Additionally, the FCC has issued a proposed rule limiting the number of federal debt collection calls to three within a 30-day period and limiting call lengths to 60 seconds or less. Id. The court concludes "that the narrow, FCC-regulated government-debt exception does not do appreciable damage to the privacy interests underlying the TCPA." Id. (quotation omitted); see Mejia, 2017 WL 3278926, at *17; Holt, 240 F. Supp. 3d at 1033; Brickman, 230 F. Supp. 3d at 1047.

As for plaintiffs' complaints about the FCC orders adding certain other narrow exemptions to the autodialing ban that the FCC issued pursuant to its delegated authority, this court lacks jurisdiction to adjudicate the validity of such orders. See Order [D.E. 26] 3; Mejia, 2017 WL 3278926, at *15 n.7. Any party wishing to challenge the substance of any order that the FCC issued under 47 U.S.C. § 227(b)(2) must file an action in "[t]he court of appeals (other than the United States Court of Appeals for the Federal Circuit) [which] has exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of all final orders of the Federal Communications Commission. . . ." 28 U.S.C. § 2342. Because this court lacks jurisdiction to entertain a constitutional challenge concerning such FCC orders, the court "does not consider those

11

exceptions for purpose of this analysis." Greenley, 271 F. Supp. 3d at 1149.

As for Congressional delegation to the FCC in 47 U.S.C. § 227(b)(2) to create exemptions, the delegation "does not substantively except any communications" and therefore "is not facially or inherently content-based." Id. After all, "there are content-neutral ways for the FCC to implement [the delegation], including relationship-based exceptions." Id. Furthermore, that Congress delegated authority to the FCC to make exemptions does not prove that the TCPA is underinclusive. See Mejia, 2017 WL 3278926, at *15; Brickman, 230 F. Supp. 3d at 1045. Indeed, Congress's delegation directs that the FCC "shall consider prescribing regulations" which would tend to increase privacy protections, and that the FCC "may" write exemptions from the autodialing ban, but only if those exemptions "will not adversely affect the privacy rights that this section is intended to protect." See 47 U.S.C. § 227(b)(2)(A)–(B) (emphasis added). Accordingly, the court rejects plaintiffs' argument that the TCPA is underinclusive. See Gallion, 2018 WL 1135386, at *6–7; Mejia, 2017 WL 3278926, at *17; Holt, 240 F. Supp. 3d at 1033–34; Brickman, 230 F. Supp. 3d at 1046–48.

As for overinclusiveness, speech restrictions may not be "overinclusive by unnecessarily circumscribing protected expression." Cahaly, 796 F.3d at 405 (quotation and alteration omitted); see Republican Party of Minn., 536 U.S. at 775. In Cahaly, the Fourth Circuit analyzed a South Carolina statute regulating automated telephone calls. Cahaly, 796 F.3d at 402. The South Carolina statute placed different restrictions on such robocalls depending on whether the calls were unsolicited and made for consumer, political, or other purposes. Id. The South Carolina statute applied "to calls with a consumer or political message but [did] not reach calls made for any other purpose." Id. at 405. The Fourth Circuit held that the South Carolina statute was "overinclusive" in that "[c]omplaint statistics show that unwanted commercial calls are a far bigger problem than

12

unsolicited calls from political or charitable organizations." Id. (quotation omitted).

Plaintiffs cite Cahaly and argue that the TCPA is similarly overinclusive. See [D.E. 31] 20–21. The South Carolina statute at issue in Cahaly, however, is distinguishable from 47 U.S.C. § 227(b)(1)(A)(iii). "Evidence compiled by Congress indicates that residential telephone subscribers consider automated or prerecorded telephone calls, regardless of the content or the initiator of the message, to be a nuisance and an invasion of privacy." Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243 § 2(10) (1991). Moreover, unlike the South Carolina statute at issue in Cahaly, "the TCPA is quite limited in what it prohibits." Brickman, 230 F. Supp. 3d at 1048. "[T]he TCPA does not restrict individuals from receiving any content they want to receive—speech that would otherwise be prohibited by the TCPA is immediately removed from the purview of the statute once express consent is provided." Id.; see Greenley, 271 F. Supp. 3d at 1150–51; Holt, 240 F. Supp. 3d at 1034. Thus, the court rejects plaintiffs' argument that the TCPA is overinclusive.

Finally, plaintiffs argue that there are a host of "less restrictive alternatives" to 47 U.S.C. § 227(b)(1)(A)(iii) that would allow Congress to achieve the legitimate purpose that it enacted the TCPA to serve. In support, plaintiffs cite the Fourth Circuit's discussion in Cahaly of time-of-day limitations, mandatory disclosure of a caller's identity, and do not call lists. See Cahaly, 796 F.3d at 405.

"If a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative." United States v. Playboy Entm't Grp., Inc., 529 U.S. 803, 813 (2000); see Cahaly, 796 F.3d at 405. However, these alternatives must "be at least as effective in achieving the legitimate purpose that [the] statute was enacted to serve." Gallion, 2018 WL 1135386, at *7 (quotation omitted); cf. Reno v. ACLU, 521 U.S. 844, 874 (1997).

Unlike the alternative applicable to the South Carolina statute at issue in Cahaly, plaintiffs

13

alternatives would not "be at least as effective in achieving the legitimate purpose" that Congress enacted the TCPA to serve. Reno, 521 U.S. at 874. "Time-of-day limitations would not achieve the same privacy objectives because even though such a restriction may designate the span of time in which callers can intrude on an individual's privacy, it would also designate a time for intrusive phone calls." Brickman, 230 F. Supp. 3d at 1048; see Gallion, 2018 WL 1135386, at *7; Greenley, 271 F. Supp. 3d at 1151; Mejia, 2017 WL 3278926, at *17; Holt, 240 F. Supp. 3d at 1034. Likewise, "[m]andatory disclosure of a caller's identity and disconnection requirements would also not be as effective in achieving residential privacy because these would not prevent the privacy intrusion from the phone call in the first place." Brickman, 230 F. Supp. 3d at 1048–49; see Gallion, 2018 WL 1135386, at *7; Greenley, 271 F. Supp. 3d at 1151; Mejia, 2017 WL 3278926, at *17; Holt, 240 F. Supp. 3d at 1034. Similarly, "[d]o-not-call lists would also not be a plausible less restrictive alternative because placing the burden on consumers to opt-out of intrusive calls, rather than requiring consumers to opt-in, would obviously not be as effective in achieving residential privacy." Brickman, 230 F. Supp. 3d at 1049; see Gallion, 2018 WL 1135386, at *7; Greenley, 271 F. Supp. 3d at 1151; Mejia, 2017 WL 3278926, at *17; Holt, 240 F. Supp. 3d at 1034. Thus, the court rejects plaintiffs' argument concerning less restrictive alternatives.

IV.

In sum, the court GRANTS defendants' motion for summary judgment [D.E. 34] and DENIES plaintiffs' motion for summary judgment [D.E. 30]. The clerk shall close the case.

SO ORDERED. This 24 day of March 2018.

JAMES C. DEVER III
Chief United States District Judge